UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT R. GORDON,

        Petitioner,

-vs-                                   Case No.  8:04-cv-355-T-17MSS

JAMES V. CROSBY, JR., et al.,

        Respondents.

_____

## ORDER DISMISSING PETITION AS TIME-BARRED

    Robert Gordon is a Florida prisoner under sentence of death. A grand jury indictment charged Gordon, Meryl McDonald, Susan Shore, Denise Davidson, and Leonardo Cisneros with first-degree murder in Dr. Louis A. Davidson's death. McDonald and Gordon were tried jointly for the murder in the Circuit Court for the Sixth Judicial Circuit, Pinellas County, Florida.

### FACTUAL AND PROCEDURAL BACKGROUND

    The following summary of facts presented during the guilt and penalty phase was set out by the Florida Supreme Court in Gordon v. State, 704 So. 2d 107 (Fla. 1997).

    Dr. Louis A. Davidson and his wife Denise were in the midst of a bitter custody battle and divorce. Both were "engaged" to other people at the time of Dr. Davidson's murder; Mrs. Davidson was "engaged" to another codefendant, Leonardo Cisneros.[1]

    Mrs. Davidson and Cisneros arranged for McDonald and Gordon to kill her husband. To that end, they made several trips from Miami to Tampa in late December 1993 and early January 1994, where several witnesses, including Gordon's friend Clyde Bethel, testified

---

[1] For clarification, the respective roles of the parties are as follows:  The victim's wife, Denise Ann Davidson, and her boyfriend, Leonardo Cisneros, hired Robert Gordon and Meryl McDonald to kill Dr. Davidson.  Gordon and McDonald hired Susan Shore to drive them from Miami, Florida, to the victim's apartment in St. Petersburg, Florida, where Dr. Davidson was killed on January 25, 1994.

that they met Cisneros; met with a lady about some money they were owed, drove past a hospital to see an emergency room; and went to the Thunder Bay Apartments to inquire about renting an apartment. Bethel was one of at least five people who drove Gordon and McDonald from Miami to Tampa in the weeks and months preceding the murder. The other individuals who, along with Bethel, testified to these trips at trial were Patricia Vega, Maurice Dixon, Brenda King, and Claudia Williams.

On January 24, 1994, McDonald and Gordon hired Susan Shore to drive them from Miami to Tampa so that they could visit a friend and "pick up a piece of paper."[2]  Upon arriving in Tampa, they met with a lady Shore later identified as Mrs. Davidson and someone named "Carlos," whom Shore later identified as Cisneros. After McDonald, Gordon, and Shore checked into a Days Inn, Cisneros "came by" and left with McDonald and Gordon. McDonald and Gordon returned later than night.

Early the next morning, January 25, 1994, they drove to Thunder Bay Apartments in St. Petersburg to "where their friend lived," presumably Dr. Davidson. While they waited for Dr. Davidson to return from his night shift at Bayfront Hospital, McDonald got out of the car and said he was going jogging. Shore and Gordon played catch with a cricket ball on the apartment grounds. When Dr. Davidson pulled into the parking lot a short time later, Gordon told Shore, "Here is my friend. You can go sit in the car now." While Gordon went over and talked to Dr. Davidson, Shore sat in the car and read a newspaper. Shore testified that Davidson and Gordon then walked toward Davidson's apartment, with Gordon following

---

[2] The "piece of paper" may have been letters from Mrs. Davidson to Dr. Davidson or vice versa. A fellow employee of Mrs. Davidson's, Pam Willis, spent the night of January 25, 1994, at Mrs. Davidson's home. That was the same day Dr. Davidson was murdered. While at Mrs. Davidson's house, Willis smelled smoke and saw burned ashes in the bathroom. The next day, Mrs. Davidson told Willis "that that was old letters that she didn't want anybody to read from the doctor that she had burned."

Davidson. She last saw Davidson and Gordon going underneath the stairwell immediately adjacent to Davidson's apartment door. Gordon came back to the car about twenty to twenty-five minutes later; McDonald returned five to ten minutes after Gordon. McDonald told Gordon that "he had the piece of paper." McDonald patted his stomach and Shore heard something crinkle.

Shore testified that as they drove back to the Days Inn motel, McDonald called "Carlos" on his cell phone and said "he had it." "Carlos" came to the hotel, talked with McDonald and Gordon, and then left. "Carlos" later returned with the lady they had met upon their arrival in Tampa. Shore identified a picture of Mrs. Davidson as the lady she had seen. A short time later, Shore, McDonald, and Gordon drove back to Miami.

Dr. Davidson's body was discovered later that day by his fiancee, Patricia Deninno. She found him blindfolded, bound, gagged, and hogtied, lying face down in a bathtub full of bloody water. He was tied with a vacuum cleaner cord and a cashmere belt. Pieces of towel were wrapped around his head and used as a gag. The toilet bowl had been broken off its foundation and the resulting water leak had partially flooded the apartment. Blood was spattered on the bathroom walls and the apartment had been ransacked. There was no indication of forced entry. Shoe prints were found on a tiled floor in the apartment. Dr. Davidson's watch, a camera, and a money clip with several hundred dollars were missing. Although the apartment had been ransacked, $19,300 in cash and some credit cards remained.

The police placed Mrs. Davidson under surveillance shortly after Dr. Davidson's murder. Using the name "Pauline White," Mrs. Davidson subsequently made numerous trips to Western Union. Evidence was later presented that twenty-one money transfers were

made, both before and after the murder, with nineteen going to Gordon. McDonald's girlfriend, Carol Cason, picked up two of the transfers at his request.

Mrs. Davidson began sending Gordon and McDonald money as early as August 1993. At oral argument, the State estimated that the amount transferred from Mrs. Davidson to Gordon and McDonald exceeded $15,000. On rebuttal, Gordon's counsel did not challenge that figure. The State further noted that Gordon and McDonald also received an undisclosed amount of money on each of the four trips they made from Miami to Tampa.

The police also obtained phone records which showed numerous contacts among the codefendants both prior to and after the murder. The records showed that on the day of the murder, Mrs. Davidson called McDonald's beeper fifty times during a period of two and a half hours. Mrs. Davidson also bought a cell phone and gave it to McDonald and Gordon, which was then used repeatedly to make hang-up calls to Dr. Davidson's home and place of work. Several Thunder Bay employees testified that McDonald and Gordon were in the management office on January 18, 1994, and received a copy of the floor plan of Dr. Davidson's apartment. Gordon's friend, Clyde Bethel, confirmed that McDonald and Gordon visited Dr. Davidson's apartment complex that day.

Physical evidence was also recovered from the Days Inn where McDonald, Gordon, and Shore spent the nights of January 24-25, 1994. A sweatshirt and a pair of tennis shoes were found in their room. The tennis shoes had the same sole pattern as the shoeprints found in Dr. Davidson's apartment. Flecks of human blood were found on the shoes, but the sample was too small to match. The sweatshirt contained fibers from Dr. Davidson's carpet and Deninno's cashmere belt, as well as hairs that matched McDonald's. Dr. Davidson's blood sample matched the DNA found in stains on the sweatshirt. Receipts

confirmed that on the day before the murder, Denise Davidson had purchased a pair of sneakers, a gray sweatshirt, and a purple sweatshirt.

The associate medical examiner, Dr. Marie Hansen, testified that Dr. Davidson had bruises on his face and shoulders, three broken ribs, and multiple lacerations on the back of his scalp, probably caused by a blunt object. The cause of death was drowning. The medical examiner could not determine whether Dr. Davidson was conscious when he died, saying it was possible that he was knocked unconscious by the first blow to his head. Dr. Hansen also testified that from the multiple bindings on his wrists, Dr. Davidson had probably freed one of his wrists during the altercation, only to be re-tied with the belt.

After a jury trial, the jury found both defendants guilty of first-degree murder. During the penalty phase, Gordon's sister, Norma Rose, testified that he was a concerned and loving brother and a kind and loving parent to his children. Gordon's mother, Estella Stuckey, testified that they had a good relationship and that Gordon was a kind and loving son. Finally, Gordon's pastor testified that he attended his church regularly from late 1991 to late 1992 and led some home Bible studies. The State did not present any further evidence during the penalty phase.

The jury recommended death sentences for both defendants by a vote of nine to three. Before Gordon's sentencing, co-defendant Denise Davidson was convicted of first-degree murder, in a separate trial.  She received a life recommendation from the jury, and was sentenced to life imprisonment. The trial judge held two <u>Spencer</u> hearings prior to sentencing Gordon to death on November 16, 1995.[3]

_____

[3] The trial court found the following statutory aggravators: (1) the murder was committed during the commission of a burglary and robbery, section 921.141(5)(d), Florida Statutes (1993); (2) the murder was committed for pecuniary gain, section 921.141(5)(f); (3) the murder was especially heinous, atrocious, or cruel (continued...)

Cisneros remains a fugitive, while Shore had the charges against her reduced to accessory after the fact, for which she received probation after agreeing to testify for the State.

Gordon appealed the sentence and conviction, raising five claims on direct appeal: (1) the trial court erred in denying Gordon's motion to strike the venire; (2) the trial court erred in denying Gordon's motion for judgment of acquittal at the close of the evidence; (3) the trial court erred in denying Gordon's request for a separate penalty phase jury from that of his codefendant and a new penalty phase jury; (4) Gordon's death sentence is disproportional; and (5) the trial court erred in finding the cold, calculated, and premeditated and heinous, atrocious, or cruel aggravating circumstances.

On November 26, 1997, rehearing denied January 16, 1998, the Florida Supreme Court held that: (1) venire composition did not violate defendant's right to have the jury selected from a fair cross-section of community, (2) the evidence was sufficient to support conviction; (3) the issue regarding separate penalty-phase juries for codefendants was procedurally barred; (4) the evidence supported the finding that murder was cold, calculated, and premeditated; (5) the finding of the heinous, atrocious or cruel aggravator was not an abuse of discretion; and (6) Gordon's death sentence was not disproportionate punishment. The Florida Supreme Court affirmed Gordon's conviction and sentence.

---

[3](...continued)
(HAC), section 921.141(5)(h); and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP), section 921.141(5)(i). The trial court found no evidence to support Gordon's proffered statutory mitigator: his age at the time of the crime. In nonstatutory mitigation, the trial court accorded Gordon's "totally unremarkable" family background very little weight; accorded his religious devotion some weight; and accorded codefendant Denise Davidson's life sentence a modest amount of weight.

Gordon v. State, 704 So. 2d 107 (Fla. 1997). Gordon did not file a Petition for Writ of Certiorari in the United States Supreme Court.

On February 17, 1999, Gordon filed a timely motion for postconviction relief, and the state trial court granted a Huff hearing on August 9, 1999. Following the Huff hearing, the state trial court summarily denied a number of Gordon's claims, but granted an evidentiary hearing on four claims. The following claims were summarily denied by the state trial court: (1) ineffective assistance of counsel in jury selection; (2) ineffective assistance of counsel for failure to move to exclude or suppress the testimony of Susan Shore; (3) ineffective assistance of counsel for failure to object to or strike the opinion testimony of Mary Anderson and Michael Celona; (4) ineffective assistance of counsel for failing to seek a separate penalty phase jury; (5) ineffective assistance of counsel for failing to seek a mistrial based on prosecutorial misconduct during closing; (6) ineffective assistance of counsel for failing to seek to exclude results of tests where the material tested had been destroyed; (7) the State of Florida violated Gordon's entitlement to certain rights established by the Vienna Convention; and (8) Gordon's due process rights were violated as a result of a conspiracy to present false evidence by state and federal authorities.

The trial court granted an evidentiary hearing on the following claims: (1) ineffective assistance of counsel in failing to present an alibi defense; (2) ineffective assistance for failing to challenge the admissibility of DNA evidence and to conduct a hearing pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923); (3) ineffective assistance of counsel for failing to move to sever; and (4) ineffective assistance of counsel for failing to thoroughly investigate and prepare for trial.

EVIDENTIARY HEARING

At Gordon's state evidentiary hearing, the four claims of ineffective assistance of counsel were addressed and denied by the state trial court.

ALIBI

First, Gordon argued that trial counsel was ineffective for failing to present an alibi defense. Counsel's failure to put on an alibi defense was discussed in detail at the evidentiary hearing, and trial counsel stated in unambiguous terms that he was against the use of an alibi defense because he was certain that it would fail. Therefore, the trial court concluded that the decision not to put on an alibi defense constituted a strategic decision. "[C]ounsel's strategic decisions will not be second-guessed on collateral attack." Johnson v. State, 769 So.2d 990, 1001 (Fla. 2000) (citing Remeta v. Dugger, 622 So.2d 452 (Fla.1993)).

Furthermore, trial counsel testified that in addition to relying on the results of the investigation that occurred prior to his appointment as Gordon's trial counsel, he hired another investigator to follow up on the alibis--none of which produced what he felt would be beneficial evidence for an alibi defense. Therefore, there was no error in the trial court's conclusion that Gordon had not satisfied the required showing of deficient performance under Strickland.

With respect to Gordon's claim that he did not voluntarily waive his alibi defense, the trial court discussed this claim at length in its order, having found that Gordon received competent advice regarding the use of an alibi defense. The record reflects that the trial court engaged in a colloquy with Gordon before the waiver. Further, the trial court pointed out that even though Gordon's and trial counsel's testimony on this issue were

contradictory, the testimony of codefendant McDonald's trial counsel was consistent with Gordon's trial counsel's testimony. There was also testimony that Gordon was adamantly against a delay in the trial. Gordon knew that severance, and therefore delay, would result if he pursued the alibi defense. Accordingly, there was no error in the denial of relief on this claim.

DNA

Next, Gordon argued that trial counsel was ineffective for failing to challenge the admissibility of DNA evidence and failing to request a <u>Frye</u> hearing. At the evidentiary hearing, trial counsel and codefendant McDonald's counsel expressly indicated that as a part of the defense strategy, it was actually desirable to present to the jury the unidentified DNA evidence that did not implicate either Gordon or McDonald, in order to corroborate the defense theory of what happened the day of the murder. It was also a part of the strategy to put before the jury the small amount of DNA that implicated McDonald because it supported the defense theory that the defendants merely went in to get a piece of paper and that another man, Leonardo Cisneros, was the real killer. In its order, the trial court discussed at length the lack of a challenge to the DNA evidence, identifying a variety of reasons that this claim did not merit relief.  Counsel's decision was an intended strategic decision.  The Florida Supreme Court, on appeal, refused to second-guess the state trial court's such a decision on this issue. <u>See Johnson v. State</u>, 769 So.2d 990, 1001 (Fla. 2000).

SEVERANCE

Gordon contended that trial counsel was ineffective for failing to move to sever his trial from that of codefendant McDonald. The evidentiary record reflected, however, that trial

counsel's decision not to move to sever was the result of a strategic decision because it would be in Gordon's best interest for Gordon and McDonald to be tried as codefendants. Strong deference is granted to the strategic decisions made by trial counsel, even where they are ultimately unsuccessful in avoiding a guilty verdict or death sentence. The Florida Supreme Court refused to second-guess "[c]ounsel's strategic decisions" on collateral attack." Johnson v. State, 769 So.2d 990, 1001 (Fla. 2000) (citing Remeta v. Dugger, 622 So.2d 452 (Fla.1993)).

Further, as noted by the state trial court, counsel could not be deemed to be ineffective for failing to raise a motion that would have been futile. Under Florida Rule of Criminal Procedure 3.152(b)(1)(A), a severance of defendants may be ordered when it is appropriate to promote a fair determination of the guilt or innocence of the defendants. A severance is not necessary when the evidence is "presented in such a manner that the jury can distinguish the evidence relating to each defendant's acts, conduct, and statements, and can then apply the law intelligently and without confusion to determine the individual defendant's guilt or innocence." Coleman v. State, 610 So.2d 1283, 1285 (Fla.1992) (quoting McCray v. State, 416 So.2d 804, 806 (Fla.1982)).

In McCray, the Florida Supreme Court affirmed a denial of severance because: (1) the defendant had a full opportunity to confront and cross-examine each of the witnesses against him; (2) none of the codefendants inculpated each other by confessing; and (3) the evidence was not too complex for the jury to apply it to each individual defendant. See 416 So.2d at 807. The record in Gordon's case reflects that the McCray criteria were satisfied. Gordon had a full opportunity to confront and cross-examine each of the witnesses against him; McDonald did not inculpate Gordon by confessing to Davidson's murder; and the

evidence was not too complex for the jury to apply it to each individual defendant. Therefore, severance would not have been proper in Gordon's case.  The Florida Supreme Court found that the state trial court properly ruled that counsel was not ineffective for failing to move to sever Gordon's case from that of codefendant McDonald. Importantly, Gordon failed to demonstrate that the same evidence presented at the joint trial would not have also been presented in a severed trial. Hence, no prejudice was demonstrated.

Gordon's argument that other strategies could have been employed if separate trials had occurred appears entirely speculative. In <u>McCray</u>, the Florida Supreme Court noted:

> [T]he fact that the defendant might have a better chance of acquittal or a strategic advantage if tried separately does not establish the right to a severance. Nor is hostility among defendants, or an attempt by one defendant to escape punishment by throwing the blame on a codefendant, a sufficient reason, by itself, to require severance.

416 So. 2d at 806 (citations omitted).

## COUNSEL'S PREPARATION

Lastly, Gordon asserted that trial counsel was ineffective for failing to thoroughly investigate and prepare. This claim appears to be a redundant attack on trial counsel's strategic decisions discussed above. Gordon's argument in this claim largely consists of reargument of the other ineffective assistance of counsel claims raised in Gordon's brief.

With respect to his claim that trial counsel did not properly investigate and prepare for trial, the trial court concluded that Gordon had not satisfied either the deficient performance requirement or the prejudice requirement under <u>Strickland</u>. Gordon's argument consists of general complaints about trial counsel's knowledge of DNA, his knowledge of the existence of an alleged document, and his failure to present other defenses.

On the other hand, the record reflects that trial counsel researched the case, investigated Gordon's alleged alibis, consulted with potential alibi witnesses, hired an independent investigator to follow up on those alibis, consulted with the Public Defenders' office investigator, consulted with the codefendant's counsel regarding trial strategy, consulted with Gordon, and hired an expert to assess Gordon's ability to understand and comprehend the proceedings. This evidence supports the trial court's rejection of this claim. The Florida Supreme Court stated, "We have emphasized that the fact that there may have been more that trial counsel could have done or that appellate counsel in reviewing the record with hindsight would have taken a different approach does not mean that trial counsel's performance during the guilt phase was deficient." See Cherry v. State, 659 So.2d 1069 (Fla.1995). Further, the trial court also considered that trial counsel's preparation was hindered because of Gordon's insistence on proceeding to trial, even though trial counsel took over the case only two months before trial.

The state trial court denied Gordon's rule 3.850 motion and Gordon appealed.  On December 18, 2003, the Florida Supreme Court affirmed the denial of rule 3.850 relief.  The mandate issued January 9, 2004. Gordon v. State, 863 So. 2d 1215 (Fla. 2003).

## PRESENT PETITION IS TIME-BARRED

The Anti-Terrorism and Effective Death Penalty Act created a new limitations period for petitions for writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of ... the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review...." 28 U.S.C. §2244(d)(1)(A).

Additionally, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

Gordon's Time-Bar Issues

When the Florida Supreme Court denied rehearing on direct appeal, on January 16, 1998, Gordon had another 90 days, or until April 16, 1998, in which to file a petition for writ of certiorari in the United States Supreme Court. Bond v. Moore, 309 F.3d 770, 774 (11th Cir. 2002) (One year period of limitation does not begin to run until the 90-day period for filing a petition for certiorari with the Supreme Court has expired); Clay v. United States, 537 U.S. 522 527 (2003) (addressing parallel federal statute and holding that section 2255's one-year limitation starts to run when the time for seeking certiorari review expires).

Title 28 U.S.C. section 2244(d)(2) applies to tolling during state collateral proceedings. Unlike direct appeal, the tolling during state collateral review occurs only while the application for "State postconviction or other collateral review . . . is pending." The time that Gordon could have sought a writ of certiorari from the denial of postconviction relief is not subject to tolling. Moore v. Crosby, 2006 WL 1490135 (11th Cir., May 30, 2006) (the 90 day period for seeking United States Supreme Court review following the state court denial of postconviction relief does not toll the time counted in determining the one-year time limit); Coates v. Byrd, 211 F.3d 1225, 1227 (11th Cir. 2000) (same); Lawrence v. Florida, 421 F.3d 1221, 1224 (11th Cir. 2005).

Likewise, a motion for appointment of federal habeas counsel does not toll the statute of limitations period under the AEDPA. A federal habeas case commences when the application for habeas relief is filed, not when a motion for appointment of federal

-13-

habeas counsel is filed. <u>Woodford v. Garceau</u>, 538 U.S. 202 (2003); <u>Issacs v. Head</u>, 300 F.3d 1232, 1245 (11th Cir. 2002); <u>Lookingbill v. Cockrell</u>, 293 F.3d 256, 263 (5th Cir. 2002). Therefore, under AEDPA, a request for appointment of habeas counsel does not stop the running of AEDPA's one-year statute of limitations. <u>Id.</u>

Pursuant to the facts and law above, Gordon's AEDPA one-year statute of limitations began on April 17, 1998. <u>See</u> 28 U.S.C. section 2244(d)(1)(A); <u>Wade v. Battle</u>, 379 F.3d 1254, 1256 (11th Cir. 2004) (holding that judgment of conviction became final when the 90-day period in which to seek a writ of certiorari from the United States Supreme court expired).

On February 17, 1999, Gordon's collateral counsel filed Gordon's motion for postconviction relief in the state trial court and AEDPA's one-year time limit was tolled at this point. (Respondent's Appendix B1/1-19). At the time Gordon filed his state motion for postconviction relief in the state trial court, 306 days had elapsed under AEDPA, and Gordon had 59 days remaining under AEDPA in which to file his federal habeas corpus petition.

The state trial court denied Gordon's motion for postconviction relief on April 23, 2002. (Respondent's Appendix B3/437-488). Gordon appealed on May 8, 2002. The Florida Supreme Court affirmed the denial of postconviction relief on December 18, 2003. <u>Gordon v. State</u>, 863 So. 2d 1215 (Fla. 2003). (Respondent's Appendix B12). The mandate issued on January 9, 2004. Gordon's state court postconviction proceedings were pending until January 9, 2004, when the state district court of appeal issued its mandate. <u>See</u> <u>Nyland v. Moore</u>, 216 F.3d 1264, 1267 (11th Cir. 2000) (concluding that, in Florida, state postconviction proceedings are pending on appeal until the mandate issues).

The time still remaining under AEDPA's statute of limitation was tolled during the entire time that Gordon's postconviction proceedings were pending in state court: beginning on February 17, 1999, and ending on January 9, 2004.

When the Florida Supreme Court issued its mandate on Gordon's postconviction appeal (January 9, 2004), Gordon still had the 59 days to file a timely federal habeas corpus petition. The statute of limitation resumed on January 10, 2004. Because 2004 was a leap year, the 59th day, which was Gordon's last day to file within AEDPA's one-year time limit, was Monday March 8, 2004.

Although Gordon filed a motion for appointment of federal habeas corpus counsel before AEDPA's deadline for filing his federal habeas petition expired on March 8, 2004, Gordon's motion for appointment of counsel did not toll AEDPA's one-year statute of limitations. See Garceau; Isaacs; Lookingbill.

Furthermore, although various habeas petitions and amended petitions have been submitted in this case, none of the petitions were timely filed. See Moore v. Crosby, 421 F.3d 1377, 1381 (11th Cir. 2003) (noting that tolling provision of section 2244(d)(2) does not operate to revive the one-year limitations period if such period has expired); see also, Duncan v. Walker, 533 U.S. 167, 181-182 (2001) (federal habeas corpus petition was not an application for state postconviction or other collateral review and, therefore, a timely section 2254 petition that is dismissed without prejudice will not toll the limitation period).

Having failed to file his federal habeas corpus petition by the deadline of March 8, 2004, Gordon is now time-barred from seeking such relief and the instant petition is untimely under the AEDPA. See Lawrence v. Florida, 421 F.3d 1221, 1227 (11th Cir. 2005) (affirming order dismissing capital inmate's federal habeas petition as untimely).

GORDON'S ARGUMENTS ALLEGING THAT
HE IS ENTITLED TO EQUITABLE TOLLING

On April 24, 1996, when the President signed into law the Antiterrorism and Effective

Death Penalty Act of 1996, 28 U.S.C. § 2244 was amended by adding the following new

subsection:

> (d)(1) A 1-year period of limitation shall apply to an
> application for a writ of habeas corpus by a person in custody
> pursuant to the judgment of a State court.  The limitation period
> shall run from the latest of--
>
>> (A) the date on which the judgment became final
>> by the conclusion of direct review or the
>> expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an
>> application created by State action in violation of
>> the Constitution or laws of the United States is
>> removed, if the applicant was prevented from
>> filing by such State action;
>>
>> (C) the date on which the constitutional right
>> asserted was initially recognized by the Supreme
>> Court, if the right has been newly recognized by
>> the Supreme Court and made retroactively
>> applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the
>> claim or claims presented could have been
>> discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State
> post-conviction or other collateral review with respect to the
> pertinent judgment or claim is pending shall not be counted
> toward any period of limitation under this subsection.

28 U.S.C. § 2244(d) (Supp. 1996).

Gordon asserts that his petition was either timely filed subsequent to the removal of

a State impediment and/or alternatively, that given the circumstances of his case, this Court

should grant the remedy of equitable tolling.  Gordon contends that the ineffectiveness of his state appointed postconviction counsel was a State impediment that entitles him to equitable tolling.

Gordon's Specific Arguments

Gordon argues that under Florida law, every convicted capital defendant is guaranteed the right to representation in collateral  proceedings. See, Fla. Stat. Sec. 27.702(2) (requires the State to provide counsel to represent persons convicted and sentenced to death). See also Spalding v. Dugger, 526 So. 2d 71, 72 (Fla. 1988).

State funded counsel is provided by either the Capital Collateral Regional Counsel or a statewide registry maintained by the Commission on Capital Cases. During his postconviction appeal, Gordon was represented by  registry counsel Baron Given, who was appointed on June 21, 2002. In order to be appointed to the registry, Given was  compelled to complete an application, which stated,

BY SIGNING THIS APPLICATION, YOU ARE  CERTIFYING:

 THAT YOU SATISFY THE MINIMUM REQUIREMENTS SET  FORTH IN s. 27.704(2) AND 27.710(1), FLORIDA   STATUTES; THAT YOU ARE COUNSEL OF RECORD FOR NOT MORE THAN FOUR POSTCONVICTION CAPITAL COLLATERAL PROCEEDINGS; THAT, IF APPOINTED TO  REPRESENT A PERSON IN POSTCONVICTION CAPITAL  COLLATERAL PROCEEDINGS, YOU WILL CONTINUE  SUCH REPRESENTATION UNDER THE TERMS AND CONDITIONS SET FORTH IN S. 27.711, FLORIDA   STATUTES, UNTIL THE SENTENCE IS REVERSED,  REDUCED, OR CARRIED OUT OR UNLESS PERMITTED TO WITHDRAW FROM REPRESENTATION BY THE TRIAL COURT; AND, THAT YOU WILL COMPLY WITH ALL CLE REQUIREMENTS.

www.floridacapitalcases.state.fl.us/Application-Attorney-  Registry.pdf

In accordance with Fla. Stat. §27.710 (3) (2005):

(3) An attorney who applies for registration and court appointment as counsel in  postconviction capital collateral proceedings must certify that he or she is

counsel of record in not more than four such proceedings and, if appointed to represent a person in postconviction capital collateral proceedings, shall continue such representation under the terms and conditions set forth in *s. 27.711* until the sentence is reversed, reduced, or carried out or unless permitted to withdraw from representation by the trial court. The court may not permit an attorney to withdraw from representation without a finding of sufficient good cause. The court may impose appropriate sanctions if it finds that an attorney has shown bad faith with respect to continuing to represent a defendant in a postconviction capital collateral proceeding. This section does not preclude the court from reassigning a case to a capital collateral regional counsel following discontinuation of representation if a conflict of interest no longer exists with respect to the case.

Additionally, Fla. Stat. §27.711 (2) (2005) provides:

(2) After appointment by the trial court under s. 27.710, the attorney must immediately file a notice of appearance with the trial court indicating acceptance of the appointment to represent the capital defendant throughout all postconviction capital collateral proceedings, including federal habeas corpus proceedings, in accordance with this section or until released by order of the trial court.

Gordon alleges he understood that Given was obligated to continue as his collateral counsel in state and federal proceedings "until the sentence is reversed, reduced, or carried out", or "until released by order of the trial court" after a "finding of sufficient good cause."

Gordon argues that when the Florida Supreme Court issued its mandate subsequent to the denial of Gordon's postconviction appeal, "Gordon still had 59 days which remained under the AEDPA in order to timely file his federal habeas petition." (Response at 10). Thus, at this point, Gordon was "poised" to file his petition within the limitation period set forth in §2244(d)(1)(A), considering that he had ample time on the clock and his counsel had already spent over a year and a half representing him and was certainly familiar with Gordon's issues.

However, according to Gordon, in contravention of his obligations in  accordance with statutory requirements, Gordon's state-mandated  counsel abandoned him, without cause, upon conclusion of the proceedings in the Florida Supreme Court.  By the time new counsel was appointed by this Court, only seven days remained on Gordon's clock under §2244(d)(1)(A).  Gordon contends that registry counsel's malfeasance foreclosed the possibility of Gordon's timely filing his federal petition.

## GORDON'S ARGUMENTS ARE NOT PERSUASIVE

Neither a "state impediment" nor equitable tolling exist in this case to exempt Gordon from the AEDPA one-year filing deadline.  First, Gordon's "state impediment" argument was rejected by the Eleventh Circuit in Lawrence v. Florida, 421 F.3d 1221, 1226 (11th Cir. 2005), cert. granted, 126 S. Ct. 1625 (2006).  Second, the circumstance of Gordon's case -- that his state court collateral counsel timely contacted and enlisted experienced federal habeas counsel for Gordon before AEDPA's one-year statute of limitations expired -- does not constitute any extraordinary basis for "equitable tolling."

Gordon cannot demonstrate that a State impediment prevented his filing timely his federal habeas petition or that equitable tolling applies to his case.  See, Jones v. Nagle, 349 F.3d 1305 (11th Cir. 2003) (noting that the petitioner bears the burden of establishing that equitable tolling is justified).  Gordon alleges that his state court collateral counsel, Baron Given, "abandoned" him. This allegation is belied by Gordon's pleadings in this Court.

On February 16, 2004, Gordon signed an affidavit which stated, in pertinent part:

5. Thomas H. Ostrander, an attorney licensed to practice in the state of Florida, and admitted to this Bar, has agreed to accept the appointment for my representation in this case. Mr. Ostrander is a member of the Florida Bar,

the Federal Bar of the Middle District, Tampa Division, and is registry counsel and qualified to pursue such litigation. (Doc. No. 2)

Furthermore, in Attorney Ostrander's Motion for Appointment, dated February 26, 2004 (Doc. No. 1), Attorney Ostrander made the following representations:

2. Mr. Given represented Mr. Gordon through the Supreme Court of Florida litigation of his request for postconviction relief. The mandate affirming the denial of Mr. Gordon's Florida postconviction motion was issued on January 18, 2003 [sic: January 9, 2004].

3. On January 18th, 2003 [sic 2004], [Attorney Ostrander] received the call from Mr. Given.

4. Mr. Given advised he did not wish to continue representing Mr. Gordon in federal court, but would ask the trial court to sign an order appointing undersigned counsel. That trial judge was The Honorable Susan R. Schaeffer of the Sixth Judicial Circuit in and for Pinellas County.

5. [Attorney Ostrander] is a Registry Counsel and is also an active member of this Court's Bar.

6. Mr. Gordon has been contacted by [Attorney Ostrander] and advised he should complete an application for appointment of counsel.

7. Mr. Given affirmatively stated he did not wish to seek a petition for Certiorari review from the United States Supreme Court on behalf of Mr. Gordon.

8. In light of the above, and in light of the strict time frames incumbent upon Mr. Gordon to pursue his federal review, [Attorney Ostrander] has begun the review and investigation necessary to complete the petition for relief required by the AEDPA.

9. At this time, the undersigned has only the record on appeal, and has only reviewed the opinion of the Supreme Court of Florida regarding Mr. Gordon.

10. There appears to be no mechanism in place for representation of Florida Death Row prisoners pursuant to the completion of the Florida postconviction litigation.

11. Since there is a definite interaction between the time frames of the state and federal litigation, this matter becomes of an urgent nature.

* * *

> 14. Mr. Gordon executed a document on the 16 day of Feb., 2004, subsequent to a telephone conference with [Attorney Ostrander], indicating that he wished undersigned counsel appointed. . . .

(Doc. No. 1)

As evidenced by the foregoing, Gordon's state collateral counsel, Attorney Baron Given, contacted successor federal counsel, Thomas Ostrander, as soon as the mandate issued on Gordon's state postconviction appeal. Rather than "abandoning" Gordon as Gordon alleges, Attorney Baron Given enlisted an experienced federal registry counsel, Attorney Thomas Ostrander, before the federal deadline expired under the AEDPA. Attorney Ostrander's own motion for appointment, in February of 2004, acknowledged his awareness of the "strict time frames incumbent upon Mr. Gordon to pursue his federal review." (Doc. No. 1, paragraph 8). Accordingly, Gordon's claim of abandonment fails to constitute any arguable basis for relief.

Gordon also claims that in light of Attorney Given's appointment in state court pursuant to § 27.710 and §27.711, Fla. Stat. (2005), Attorney Given was obligated to continue as Gordon's counsel in federal court. However, Gordon's argument is rendered moot, and irrelevant, by virtue of Attorney Ostrander's timely appointment in federal court. Gordon also contends that the alleged "state impediment was not removed until March 1, 2004, when this Court appointed federal counsel to represent Mr. Gordon." (Doc. No. 56, at page 9). Even if this Court should accept Gordon's suggestion that the deadline in his case should be "equitably tolled" until the date of Attorney Ostrander's appointment on March 1, 2004, Gordon's federal habeas petition still was not filed within the remaining 59 days after March 1, 2004, *i.e.*, by May 1, 2004.

In <u>Lawrence</u>, the Eleventh Circuit squarely rejected another capital inmate's claims of alleged state impediment/equitable tolling. The Eleventh Circuit explained:

> Lawrence contends that 28 U.S.C. § 2244(d)(1)(B) [n2] applies to his case because the State caused an impediment to his timely filing by providing him with an incompetent attorney through the Florida counsel registry system.
>
> . . . Assuming Lawrence presented this issue to the district court, we conclude that Lawrence's assertion that the State impeded him from timely filing by providing an incompetent attorney to assist him after setting up a State registry system to monitor attorney performance, is meritless. This is not the type of State impediment envisioned in § 2244(d)(1)(B).
>
> Additionally, Lawrence cannot show that there are extraordinary circumstances present in his case to warrant the application of equitable tolling. "Equitable tolling is an extraordinary remedy which is typically applied sparingly." <u>Steed</u>, 219 F.3d at 1300. It is available "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." <u>Sandvik v. United States</u>, 177 F.3d 1269, 1271 (11th Cir. 1999). Equitable tolling is limited to rare and exceptional circumstances, such as when the State's conduct prevents the petitioner from timely filing. <u>Gibson v. Klinger</u>, 232 F.3d 799, 808 (10th Cir. 2000); <u>see also Irwin v. Dep't of Veterans Affairs</u>, 498 U.S. 89, 96, 111 S. Ct. 453, 458, 112 L. Ed. 2d 435 (1990) (stating that the Court has allowed equitable tolling in situations where complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass); <u>Arce v. Garcia</u>, 400 F.3d 1340, 1349 (11th Cir. 2005) (noting that in order to invoke equitable tolling, courts usually require some affirmative misconduct, such as deliberate concealment).
>
> Making the most of a novel argument, Lawrence posits that the State's provision to him of an incompetent attorney justifies the imposition of equitable tolling. This is not an extraordinary circumstance that warrants the application of equitable tolling. Moreover, we have stated on numerous occasions that "attorney negligence is not a basis for equitable tolling, especially when the petitioner cannot establish his own diligence in ascertaining the federal habeas filing deadline." <u>Howell v. Crosby</u>, 415 F.3d 1250, 1250 (11th Cir. 2005); <u>accord Helton v. Secretary for the Dep't of Corr.</u>, 259 F.3d 1310, 1313 (11th Cir. 2001); <u>Steed</u>, 219 F.3d at 1300; <u>Sandvik</u>, 177 F.3d at 1270.
>
> Lawrence also contends that his mental incapacity prevented him from timely filing and justifies the invocation of equitable tolling. However, Lawrence cannot establish a causal connection between his alleged mental incapacity and his ability to file a timely petition. Lawrence admits in his

appellate brief that medical reports state that his full scale IQ is 81, and he admits that he did not make the assertion that he was mentally incompetent per se. Instead, Lawrence claims that his initial pleading made it clear that he has suffered from mental impairments his entire life. However, this contention, without more, is insufficient to justify equitable tolling. See Bilbrey v. Douglas, 124 Fed. Appx. 971, 973 (6th Cir. 2005) (finding that equitable tolling did not apply because petitioner "failed to establish a causal connection between her mental condition and her ability to file a timely petition"); Green v. Hinsley, 116 Fed. Appx. 749, 751 (7th Cir. 2004) (finding that equitable tolling did not apply because petitioner failed to submit evidence of how his low IQ would render him incompetent or prevent him from timely filing his petition); Fisher v. Gibson, 262 F.3d 1135, 1145 (10th Cir. 2001) (finding that petitioner's mere allegations of incompetency at the time of his guilty pleas did not suffice to warrant equitable tolling of the limitations period); Collins v. Scurr, 230 F.3d 1362 (8th Cir. 2000) (Table) (finding that bald and unsupported assertions that relate to an instance of alleged mental incompetency that occurred at a time remote to petitioner's habeas petition filing deadline did not equitably toll the statute of limitations); Fisher v. Johnson, 174 F.3d 710, 716 (5th Cir. 1999) (finding that equitable tolling did not apply when petitioner's brief period of incapacity "occurred at a time so remote to his deadline" and petitioner could not show that he diligently pursued his application the remainder of the one-year filing deadline); cf. Laws v. Lamarque, 351 F.3d 919, 923 (9th Cir. 2003) (remanding case for further factual development on issue of whether petitioner's mental illness prevented him from timely filing his federal habeas petition as to warrant the application of equitable tolling); Nara v. Frank, 264 F.3d 310, 320 (3d Cir. 2001) (remanding case for further factual development where petitioner "presented evidence of ongoing, if not consecutive, periods of mental incompetency" because mental incompetence may constitute an extraordinary circumstance for purposes of tolling the statute of limitations when a person's mental deficiency affects his ability to file a timely habeas petition).

Lawrence, 421 F.3d at 1225-1227.  Three of the four cases cited by Gordon at page 10 of his response (Doc. No. 56): Sandvik v. United States, 177 F.3d 1269, 1271 (11th Cir. 1999); Nara v. Frank, 264 F.3d 310, 320 (3d Cir. 2001), overruled on other grounds by Carey v. Saffold, 536 U.S. 214 (2002); and Arce v. Garcia, 400 F.3d 1340, 1349 (11th Cir. 2005) were also cited by the Eleventh Circuit in Lawrence. In Lawrence, the Eleventh Circuit clearly ruled that the inmate's "assertion that the State impeded him from timely filing by providing an incompetent attorney to assist him after setting up a State registry system

to monitor attorney performance, is meritless. This is not the type of State impediment envisioned in § 2244(d)(1)(B)." Id. Furthermore, Lawrence cannot show "that there are extraordinary circumstances present in his case to warrant the application of equitable tolling." Id.

Gordon also relies on the Eighth Circuit's decision in United States v. Martin, 408 F.3d 1089, 1094-4 (8th Cir. 2005), which summarizes various collected cases from the Second, Third, Fifth, Seventh, Eighth, and Ninth Circuits on "equitable tolling." (Doc. No. 56 at pages 11-12). In Martin, defense counsel "consistently lied to Martin and his wife about the filing deadline; repeatedly lied to Martin and his wife about the status of Martin's case; refused to communicate with Martin or his family; neglected to file any documents, belated or not, on Martin's behalf; and failed to return any of Martin's paperwork to him despite repeated requests and then demands." Martin, 408 F.3d at 1095. Accordingly, the Court found that such conduct "presents the type of egregious attorney misconduct that may excuse an untimely filing." Id.

The circumstances of Gordon's case – that state collateral counsel timely enlisted federal registry counsel – are not contrary to any of the cases collected in Martin. See, e.g., Spitsyn v. Moore, 345 F.3d 796, 798 (9th Cir. 2003) (tolling statute of limitations due to the "extraordinary circumstance" of egregious misconduct); United States v. Wynn, 292 F.3d 226, 230 (5th Cir. 2002) (ruling that petitioner's "allegation that he was deceived by his attorney into believing that a timely § 2255 motion had been filed on his behalf presents a 'rare and extraordinary circumstance' beyond petitioner's control that could warrant equitable tolling of the statute of limitations" if petitioner reasonably relied on the attorney's misrepresentations).

Lastly, Gordon also relies on a quote from the Eleventh Circuit's opinion in <u>Aron v.</u> <u>United States</u>, 291 F. 3d 708, 712 (11th Cir. 2002) (Doc. No. 56 at page 13). In <u>Aron</u>, a § 2255 proceeding, the Eleventh Circuit remanded for an evidentiary hearing on whether the defendant exercised due diligence in discovering the facts relating to his claims of ineffective assistance of appellate counsel.

Gordon does not cite any case which purportedly holds that the fact that a petition must be filed on an expedited basis, alone, constitutes a basis for "equitable tolling." Having failed to file his federal habeas corpus petition by the deadline of March 8, 2004, and having failed to establish the existence of any state impediment or any extraordinary circumstances demonstrating a basis for equitable tolling, Gordon is time-barred from seeking such relief.

Accordingly, the Court orders:

That Gordon's petition is dismissed as time-barred.  The Clerk is directed to enter judgment against Gordon and to close this case.

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). <u>Id.</u> "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." <u>Id.</u> at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to

proceed further, ' " <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on August 25, 2006.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Counsel of Record